**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  4:18-CR-392 CDP/PLC** |
| | ) | |
| **SAMUEL SMITH, JR.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court following a hearing on Defendant's Motions to Suppress Statements [ECF No. 73] and Physical Evidence [ECF No. 75].  Defendant contends that his statements were: (1) obtained following his improper seizure; (2) involuntary; (3) elicited without "full and effective" <u>Miranda</u> warnings; and (4) the product of an illegal search of his home.[1]  With respect to the physical evidence, Defendant asserts that the search warrant: (1) lacked probable cause to search Defendant's residence because the affidavit in support was insufficient; and (2) was overbroad and not sufficiently particularized with respect to the search of seized electronic devices.  The Government counters that Defendant was properly detained and his statements were voluntary.  Regarding the physical evidence, the Government argues that the search warrant was supported by probable cause and was proper in scope.

**Factual Background**

At the hearing, an FBI Special Agent based in Detroit, Michigan, Raymond Nichols, testified.  Agent Nichols stated that he was assigned to the Southeast Michigan Trafficking and

---

[1]  Defendant failed to develop the fourth basis (statements were the product of an illegal search) [ECF No. 73 at 1] in either his memorandum filed in support of the motion to suppress statements [ECF No. 74] or in his post-hearing memorandum [ECF No. 96].  Accordingly, the Court declines to further address Defendant's fourth basis for his motion to suppress statements.

Exploitation Crimes Task Force (SEMTEL).  SEMTEL investigates human trafficking, juvenile sex trafficking and child pornography.

In May 2018, Agent Nichols was "assigned a lead" regarding Defendant from the St. Louis Division of the FBI.  Agent Nichols initially spoke with a St. Louis FBI agent, Nikki Badolato, about what "she actually wanted to accomplish."  Agent Badolato advised Agent Nichols that the St. Louis Division was investigating Defendant along with co-defendant Lisa Baumann.  Two minor victims, both children of Lisa Baumann, alleged she and Defendant sexually abused them.  The St. Louis FBI had photographs relevant to the investigation from a cellphone obtained from one of the minor victims.  One of the cellphone photographs depicted a white semi-truck with a visible trucking company name.  In some of the truck pictures, two juvenile males, identified as Baumann's minor children, were depicted with an adult male, identified as Defendant.

Agent Nichols learned that the trucking company name was Red D Transport in Ida, Michigan.  Agent Nichols contacted Red D Transport and obtained fuel logs for a truck driven by Defendant.  Agent Nichols was able to approximate the truck's route in July 2017 based on fuel logs as well as pick-up and drop-off points for loads Defendant transported.

From the information Agent Nichols developed, as well as the information he obtained from the St. Louis FBI, Agent Nichols applied for a search warrant on May 24, 2018 [ECF No. 82-1].  His affidavit accompanying the application [ECF No. 82-1 at 2-33] requested a warrant to search 348 Yorkshire, Newport, Michigan, including the "residential dwelling" and any computer and/or electronic storage devices located there.  The affidavit also sought a warrant to search a "detached storage building" and motor vehicles at 348 Yorkshire.  In addition the affidavit, through attachment B [ECF No. 82-1 at 35-38], identified the items to be seized

including, among other things: photographs, video or other depictions of Lisa Baumann and the two minor victims; cell phones, tablets, computer and electronic devices; visual depictions, including still images, video and films of minors engaged in "explicit conduct as defined in 18 U.S.C. § 2256"; mechanisms for storage; documents, records, emails and internet history pertaining to minors engaged in explicit conduct or to the "enticement of a minor to engage in illegal sex acts;" and records related to the ownership or use of the electronic devices and equipment found in the subject residence.

The affidavit in support of the warrant application detailed the information obtained from the St. Louis Division of the FBI regarding allegations that co-defendant Lisa Baumann and Defendant sexually assaulted a minor victim ("the first minor victim") in July 2017.  That minor victim provided a cellphone to law enforcement that contained pictures of, among other things, the minor victim's penis in an adult hand and two male children in a semi-truck with an adult male and the name Red D Transport on the door of the truck.

The affidavit further detailed interviews with Baumann regarding allegations of child sexual abuse as well as with a second minor victim, the brother of the first minor victim.  The second minor victim reported that he had seen on a cellphone multiple videos of Baumann, the first minor victim and Defendant.  Among the images were Baumann and the first minor victim engaged in sexual intercourse and Defendant instructing the first minor victim to perform sexual acts on Baumann.

The interview with Baumann disclosed that she transported the first minor victim to meet Defendant in Pevely, Missouri for the purpose of having sex.  Baumann also admitted the image on the first minor victim's cellphone was her hand on his penis.  She further advised law enforcement that the image of a naked adult male contained on the first minor victim's cellphone

3

was Defendant, whom she identified as "a registered sex offender in the state of Michigan."

In May 2018, both minor victims were interviewed by the Children's Advocacy Center in Missouri and reiterated allegations of sexual abuse.  The second minor victim disclosed that he had seen multiple videos of sexual activity between Baumann and the first minor victim and that Baumann sent videos of sexual activity between herself and the first minor victim to Defendant.

The affidavit described Agent Nichols' investigation of Defendant's employment and his trucking route on certain days in July 2017.  The affidavit disclosed that Agent Nichols mapped Defendant's trucking route and established that Defendant would likely travel through Pevely, Missouri during that route.

The affidavit further detailed surveillance that Agent Nichols conducted of the subject residence in May 2018.  Agent Nichols observed two vehicles registered to Defendant on the subject premises.  Agent Nichols also noted Defendant departing the premises in one of the vehicles as well as returning to the subject premises.

Agents executed the search warrant on May 31, 2018, around 6:45 a.m.  Agent Nichols knocked on the door of the residence, announced FBI search warrant, and within seconds, Defendant appeared at the door.  The agents evacuated several dogs, several children and Defendant's wife from the house.  An FBI agent escorted Defendant from the residence. Approximately five to ten minutes elapsed before Agent Nichols again encountered Defendant. At the second encounter, Defendant was handcuffed and standing near the end of his driveway. Agent Nichols explained that the FBI was executing a search warrant and that he wanted to speak with Defendant.  Defendant agreed to speak with Agent Nichols and he was placed in the back of an SUV parked in proximity to the residence.  Agent Nichols sat in the SUV with Defendant.

Agent Nichols recorded the interview with Defendant.  Agent Nichols first explained that the FBI obtained a search warrant for Defendant's house.  Before allowing Defendant to answer any questions, Agent Nichols stated the following:

> Right.  Right.  And we'll get into that.  The first things I want to do though, is I want to make sure you're aware, aware of your rights, right.  So, you, you got the right to remain silent.  Uh, you're not under arrest.  Um, anything you [  ] could be used against you.  You got the right to talk to a lawyer.  Um, and you can have a lawyer with you during questioning if you wanted.  If you can't afford one, one could be appointed for you.  You understand those?

Defendant replied, "Yes I do."

Approximately mid-way through the recorded interview, Defendant advised that he was an epileptic requiring medicine.  In response, agents immediately arranged to provide Defendant his epilepsy medicine.  Defendant took his epilepsy medicine shortly after receiving it - - mere moments after advising of his condition.  During the interview, Defendant admitted knowing both Baumann and her sons as well as meeting Baumann's sons at least once in Missouri.  Defendant further admitted to a relationship with Baumann.  Defendant denied any sexual contact with Baumann's sons.  Finally, Defendant agreed to take a polygraph test.

To facilitate the polygraph examination, Agent Nichols and another agent drove Defendant from his residence to the Michigan State Police Department in Monroe and arrived at approximately 7:50 a.m.  Agent Nichols was present as the polygraph examiner, Michael Fitzgerald, administered Miranda[2] rights.  Defendant signed a consent form that contained a written statement of his Miranda rights and also the following language directly above his signature: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."

Polygraph examiner Michael Fitzgerald also testified at the hearing.  Agent Fitzgerald

---

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

worked for the FBI as a polygraph examiner in the Detroit division.  At the time of Defendant's examination, Agent Fitzgerald had performed polygraph examinations for eight years.  Agent Fitzgerald stated that Defendant was given an Advice of Rights form and a polygraph consent form.  Agent Fitzgerald instructed Defendant to read his rights out loud and asked Defendant if he had questions.  Agent Fitzgerald asked Defendant if he would be willing to sign the forms and Defendant signed the forms.  The consent form advised that Defendant had the option to refuse to take the polygraph and also to stop the test at any time.

Agent Fitzgerald provided Defendant with water, multiple bathroom breaks and a mint during the polygraph examination.  Agent Fitzgerald offered Defendant food but he declined.

Agent Fitzgerald testified that Defendant never asked to speak to an attorney.  He also stated that he discussed Defendant's medications with him.  He noted that Defendant did not appear "under the influence of any medications that would impair his cognitive abilities." Defendant was conversational throughout the polygraph examination and provided appropriate responses.

Following the polygraph examination, Agent Fitzgerald conducted a recorded, post-polygraph interview.  Agent Nichols was not present for the questioning but was listening in a nearby room.  Agent Fitzgerald acknowledged that he advised Defendant that lying to a federal agent was a crime.  However, he denied that his intent in admonishing Defendant was to coerce or intimidate Defendant.

During the post-polygraph interview, Defendant was responsive to all questions. Defendant did not ask for food or water but was provided with a bottle of water.  Defendant was also offered food but again declined.

The post-polygraph interview lasted approximately an hour - -from approximately 10:16

a.m. to 11:17 a.m.  Initially, Defendant denied sexual contact with Baumann's son.  However, he later acknowledged that he saw Baumann have sexual contact with her son while the three of them were in his truck at the truck stop in Pevely, Missouri.  After additional discussion, Defendant admitted to participating in sexual activity with Baumann and her son in Defendant's truck at a truck stop in Pevely.  However, Defendant adamantly and consistently denied that such activity occurred more than once.  The interview concluded with a bathroom break at Defendant's request and Defendant's acknowledgement to Agent Fitzgerald that Agent Fitzgerald treated Defendant with respect.

## Discussion

A. Statements

1. Unconstitutional Seizure

Defendant contends that law enforcement "unconstitutionally seized" him when he was placed into an SUV while agents searched his home [ECF Nos. 74 and 96].  Defendant has not further elaborated on this argument beyond the conclusory statement that removing him from his home and placing him in a patrol vehicle is an "unlawful seizure and detention in violation of the Fourth Amendment …." [ECF Nos. 74 and 96].

Neither of Defendant's briefs contain any case law support for the proposition that it is unconstitutional to place a suspect in a patrol car parked at the scene of the search while a search warrant is executed at a residence.  To the contrary, the United States Supreme Court has held that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's property is justified, it is constitutionally reasonable to persuade that citizen to remain while officers of the law execute a valid search warrant to search his home."  Michigan v. Summers, 452 U.S. 692, 704-05 (1981).  The Supreme

Court broadened the permissible scope of a detention during execution of a search warrant at a residence to include handcuffing an occupant of the residence in <u>Muehler v. Mena</u>, 544 U.S. 93, 98-100 (2005) (handcuffed individual's detention for the duration of the search was reasonable under <u>Summers</u> because a warrant existed to search the premises and individual was an occupant of that address at the time of the search).

In this case, Defendant was removed from his home, detained in a car parked near the home while it was searched, and asked if he would speak with Agent Nicholas.  He agreed to speak with Agent Nicholas and was administered <u>Miranda</u> warnings.  Based on the circumstances law enforcement encountered at the house (a trailer home that was a "mess" containing several dogs, children and Defendant's wife), detaining and handcuffing Defendant to facilitate conducting the search was not unconstitutional.[3]

2.  <u>Involuntary/duress</u>

Defendant claims that statements to law enforcement both "in the SUV and at the Michigan Highway Patrol should be suppressed as they were not voluntary and were the product of duress." [ECF No. 96].  The Government, counters, in essence, that based on the totality of the circumstances, Defendant's statements were voluntary.

Both the Government and Defendant appear to agree on the case law governing an assessment of voluntariness.  It is well-settled that there is no "talismanic definition of 'voluntariness,'" and a court must determine whether a statement was voluntary by looking at the totality of the circumstances.  <u>Schneckloth v. Bustamante</u>, 412 U.S. 218, 224-26 (1973); <u>see also</u>

---

[3]  Even if Defendant's initial detention constituted an arrest, Defendant provides no argument or case law for the proposition that law enforcement lacked probable cause to arrest him.  Indeed, Agent Nichols testified at the hearing that he believed he had probable cause to arrest Defendant based on the statements of Lisa Baumann and her children.  Defendant does not challenge this information as constituting an insufficient basis for probable cause.  Based on the record before this Court, the Court concludes that there was probable cause to arrest Defendant.

United States v. Williams, 793 F.3d 957, 962 (8th Cir. 2015) ("To determine whether a statement is voluntary [the court] examine[s] the totality of the circumstances…."). Importantly, the Supreme Court has explained that "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' …." Colorado v. Connelly, 479 U.S. 157, 167 (1986). See also United States v. Bordeaux, 400 F.3d 548, 560-61 (8th Cir. 2005); United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (per curiam); United States v. Robinson, 20 F.3d 320, 322 (8th Cir. 1994). In short, "[a] statement is involuntary when it [is] extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc) (internal quotation marks omitted) (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)).

Defendant seems to focus primarily on the undisputed fact that he ingested anti-seizure medication without food during his initial interview with Agent Nichols. "Intoxication and fatigue do not render a confession involuntary; rather the test is whether these mental impairments cause the defendant's will to be overborne." United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990); United States v. Jones, 842 F.3d 1077, 1083 (8th Cir. 2016) (internal quotation marks omitted) (quoting Casal, 915 F.2d at 1229). Defendant does not further explain how such circumstances constitute duress. Rather, the record supports a determination that Defendant was cooperative, coherent and appeared to entirely understand his situation. Based upon a review of the initial recorded interview, the second recorded interview and Agent Nichols' in-court testimony, the Court concludes that Defendant fails to establish that Defendant's will was overborne due to his ingestion of prescribed medication without food. See Jones, 842 F.3d at 1083 (rejecting claim of involuntariness where statements were made under

the influence of a prescription drug and officers testified the defendant was coherent during the confession); United States v. Martin, 369 F.3d 1046, 1056 (8th Cir. 2004) (confession deemed voluntary where district court found that the defendant was "not suffering from any significant physical or mental impairment as a result of illness or medication during his interviews"); United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996) (district court's rejection of claim of involuntariness due to influence of a narcotic upheld where agent testified the defendant did not appear to be affected, and was coherent, composed and cooperative during the interrogation).

Defendant also claims in his post-hearing brief that his statement was rendered involuntary by Agent Fitzgerald's comment to him that lying to a federal agent was a crime.  At the hearing, Agent Fitzgerald denied that he was attempting either to coerce or intimidate Defendant.  The recordings of Agent Fitzgerald's interview support a determination that Defendant was not coerced by Agent Fitzgerald's statement.  First, Agent Fitzgerald accurately advised Defendant that lying to a federal agent is a crime.   It is expressly "permissible to elicit further statements by claiming not to believe" a defendant's denials.  Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993).   Moreover, "[a]dmonishing a suspect to tell the truth during an investigatory interview by informing him of the statutory penalty under 18 U.S.C.A. § 1001 for making false statements does not constitute coercive police conduct rendering a statement involuntary."  United States v. Braxton, 112 F.3d 777, 782 (4th Cir. 1997) (en banc); accord Dowell v. Lincoln Cty., Mo., 762 F.3d 770, 776 (8th Cir. 2014) (noting in a civil rights action under 42 U.S.C.  1983 that "[a]n officer . . . may make a truthful statement regarding a possible punishment without it overbearing a defendant's will").

Second, when confronted with Agent Fitzgerald's statement, Defendant did not respond as if he were intimidated.  Rather, he stated "I'm being truthful."  Defendant continued to insist

that he was aware of only one instance of a sexual interaction with Baumann's son.  Even when Defendant commented to Agent Fitzgerald "I'm going away for a long time right," Defendant refused to admit that a sexual encounter occurred more than once.  Under these circumstances, it is quite evident that Defendant's will was not overborne by Agent Fitzgerald's brief comment that lying to a federal agent is a crime.  See Jenner, 982 F.2d at 334 ("Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne").

    3.  <u>Miranda warnings</u>

Defendant claims in his initial memorandum in support of his motion that he "was not sufficiently advised of his constitutional rights per the <u>Miranda</u> . . . decision prior to law enforcement questioning him in the vehicle" [ECF No. 74 at 5].   In his post-hearing memorandum, Defendant alters his position and contends that "[l]aw enforcement may have pro forma advised Mr. Smith of his rights under <u>Miranda</u>, however he did not have a clear, unthreatened mind to be able to waive those rights" [ECF No. 96 at 7].

Defendant appears to concede that law enforcement administered <u>Miranda</u> warnings prior to any statements.  Indeed, the record is clear that prior to any statements, law enforcement administered <u>Miranda</u> warnings to Defendant and he did not invoke his right to remain silent or request counsel.  Moreover, Defendant clearly stated that he understood his rights.  As the Supreme Court stated in <u>Berkemer v. McCarthy</u>, 468 U.S. 420 (1984), "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare."  <u>Id.</u> at 433 n. 20.

Here the record does not support any finding of coercive police conduct.  Nor is there any evidence that Defendant's mind was not clear enough to understand his rights.  In particular, the record is devoid of any evidence that either Defendant's ingestion of medication or his rejection of offers of food following ingestion of his medication rendered him unable to freely and voluntarily relinquish his rights and provide uncoerced statements.[4]

B.  Physical Evidence

Defendant contends that the Court should suppress the physical evidence because: (1) the search warrant for the residence lacked probable cause due to a deficient affidavit; and (2) the search warrant for the electronic media was overbroad and insufficiently particularized.  The Government counters that the affidavit attached to the warrant provides sufficient probable cause and the search warrant was adequately particularized.

1.  Probable cause

To be valid, search warrants must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched.  See, e.g, Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 301-09 (1967); Johnson v. United States, 333 U.S. 10, 13-15 (1948); Fed. R. Crim. P. 41.  The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme

---

[4]   Defendant's invocation of Missouri v. Seibert, 542 U.S. 600 (2004), to contend "law enforcement deployed unconstitutional tactics . . . to coerce and manipulate [Defendant] into making inculpatory statements" [ECF No. 96 at 8] is unavailing.  In Seibert, an officer first questioned a suspect without administering a Miranda warning and the suspect confessed.  Seibert, 542 U.S. at 604-05.  After administering a Miranda warning, the officer confronted the suspect with her earlier confession and she confessed a second time.  Id. at 605-06.  When officers "do not purposefully elicit an unwarned confession from a suspect in an effort to circumvent Miranda requirements," Seibert is not implicated.  United States v. Morgan, 729 F.3d 1086, 1091-92 (8th Cir. 2013).  Here there is no evidence of unwarned statements, let alone a purposeful attempt to circumvent Miranda.

Court on numerous occasions.  "In dealing with probable cause … as the very name implies, [a court]  deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949).  Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983). Search warrant applications and affidavits should be read with common sense and not in a "grudging," "hypertechnical" fashion.  See United States v. Ventresca, 380 U.S. 102, 108-09 (1965).

It is well-established that, when the issuing judge relies upon the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks and citations omitted); see also United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) (same) (internal quotation marks and citation omitted).  Probable cause may be found in observations made by trained law enforcement officers. Ornelas v. United States, 517 U.S. 690, 700 (1996) ("… our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists").  Information contained in applications and affidavits for search warrants must be examined for probable cause by reviewing the totality of the circumstances presented.  Gates, 462 U.S. at 230-31.  Once a judicial officer has issued a search warrant upon a finding of probable cause, that finding deserves great deference.  Id. at 236; see also United States v. Macklin, 902 F.2d 1320, 1324 (8th Cir. 1990) ("… this court does not conduct a de novo review of the issuing judge's determination, but must instead afford it great deference").

13

Defendant appears to primarily challenge the affidavit supporting the application for the search warrant based on an absence of detail in the affidavit regarding the reliability of Baumann, Defendant's co-defendant and the mother of the two minor victims.  In United States v. Brackett, the Eighth Circuit considered whether an affidavit based primarily on victim allegations in a child pornography case was sufficient to support a warrant to search a defendant's residence for digital media including, computers, cell phones and external storage devices.  846 F.3d 987, 993 (8th Cir. 2017).  Upholding a district court's determination of sufficiency to support probable cause, the Eighth Circuit highlighted the type of information that is in Agent Nichols' affidavit, including detailed information from the victim regarding sexual contact, allegations of sexual contact recorded on cell phones, and information about a defendant's name and vehicle.  Id. at 992-93.  The affidavit in Brackett also included information regarding the defendant's status as a sex offender.  Id. at 993.  Reviewing the totality of the circumstances, the Eighth Circuit concluded that "the information set forth in [the detective]'s affidavit was sufficient to establish a fair probability that prohibited images of [the victim] would be found in [the defendant]'s residence and thus enable the issuing judge to determine that probable cause existed to issue the warrant to search [the defendant]'s residence."  Id.

Here the issuing judge encountered an extremely detailed affidavit in support of the search warrant.  The information included details regarding allegations of sex acts between the first minor victim and Defendant, cellphone photographs of the first minor victim and his brother with Defendant in front of Defendant's semi-truck, Baumann's description of identifying details about Defendant, and allegations that the first minor victim's brother saw multiple videos on a cell phone that depicted Defendant, Baumann and the first minor victim engaged in sexual acts. The first minor victim's brother also alleged that Baumann recorded sexual activity involving the

14

first minor victim with her cellphone and sent it to Defendant.  Based on the totality of the circumstances, there is no question that the affidavit sufficiently supported the search warrant.

    2.  Particularity

Defendant contends the search warrant lacked particularity with respect to the search of electronic items "not yet known or seized."  In addition, in his post-hearing brief, Defendant claims the warrant lacked "search protocols"[5] and thus, failed to comport with the Fourth Amendment.  Finally, Defendant invokes Riley v. California, 573 U.S. 373 (2014) (discussing warrantless search of digital information on a cell phone seized incident to an arrest), for the proposition that agents needed "a specific warrant to search" the electronic devices they seized.[6] [ECF No. 96 at 9].

In addition to probable cause, the Fourth Amendment also requires that search warrants

---

[5]  With respect to absence of search protocols, Defendant cites no authority for his argument and in fact, has not developed the argument beyond a conclusory unsupported statement.  See ECF No. 96 at 10.

[6]  With respect to Riley v. California, 573 U.S. 373 (2014), the Court agrees that the FBI needed a search warrant to search Defendant's electronic devices and media, including cell phones. However, in light of the determination below that the search warrant was constitutional, there was a constitutional basis to not only seize but also search the electronic devices and media, including cell phones.  See United States v. Fifer, 863 F.3d 759, 766-67 (7th Cir. 2017) (discussing the warrantless search of electronic devices at the site of and during the search of premises pursuant to a warrant); United States v. Castro, 881 F.2d 961, 967 (6th Cir. 2018) ("federal officers may use a state warrant [to search a cell phone] to conduct a follow-up search of a seized cell phone without obtaining a second warrant so long as the search does not exceed the probable cause articulated in the original warrant").  That is, agents did not need a separate warrant to search (in addition to seize) Defendant's electronic devices and media, including his cell phones.  Defendant has provided no contrary authority.

To the extent the Eighth Circuit requires a warrant before police search a computerized device, see United States v. Horton, 863 F.3d 1041, 1047 (8th Cir. 2017) (citing Riley,  573 U.S. at 403), cert. denied, 138 S. Ct. 1440 (2018), the warrant here regarding the search of any seized electronic devices and media, including cell phones, [ECF No. 82-1 at 23-31] is sufficiently detailed about the search methods law enforcement would use to search those items, and the basis for seizing those items [ECF No. 82-1 at 1-23] that the constitutional requirements of probable cause and particularity are satisfied for both the seizure and the search of those items.

satisfy a particularity requirement.  Particularity prevents the issuance of general warrants.  <u>See</u> <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742-43 (2011) ("The principal evil of the general warrant was addressed by the Fourth Amendment's particularity requirement"); <u>see</u> <u>also</u> <u>Payton v. New York</u>, 445 U.S. 573, 583-84 (1980).  There are two-dimensions to the particularity requirement.  <u>See</u> <u>Dalia v. United States</u>, 441 U.S. 238, 255 (1979).  First, the warrant must particularly describe the place, person, or thing to be searched.  <u>See</u> <u>id.</u> at 255-57.  Second, the warrant must particularly describe the evidence or items to be seized.  <u>Id.</u> <u>Accord</u> <u>United States v. Grubbs</u>, 547 U.S. 90, 97 (2006) (the Fourth Amendment "does not set forth some general 'particularity requirement.'  It specifies only two matters that must be particularly describ[ed] in the warrant: 'the place to be searched' and 'the persons or things to be seized'" (alteration in original)).  As the Eighth Circuit has explained, "[t]he particularity requirement can be satisfied by listing the items to be seized in the warrant itself or in an affidavit that is incorporated into the warrant." <u>United States v. Szczerba</u>, 897 F.3d 929, 937 (8th Cir. 2018) (citation omitted), <u>cert. denied</u>, 139 S. Ct. 1544 (U.S. Apr. 15, 2019) (No. 18-6905).  Importantly, there is "[n]othing in the language of the Constitution or in [the Supreme] Court's decisions interpreting [the precise and clear words of the Fourth Amendment] that" requires search warrants to also "include a specification of the precise manner in which they are to be executed."  <u>Grubbs</u>, 547 U.S. at 98 (internal quotation marks omitted) (quoting <u>Dalia</u>, 441 U.S. at 257).

Applying the above principles to the search warrant here, it is clear that it is sufficiently particularized.  Attachment B to the Application for Search Warrant, and affidavit, [ECF No. 82-1 at 35-38] sets out the specific categories of items to be seized and limits the items to materials which constitute evidence of  identified criminal offenses, namely violations of "18 U.S.C. § 2423(b) (travel with intent to engage in illicit sexual conduct), 18 U.S.C. § 2251(a) (production

of child pornography), 18 U.S.C. § 2252A(a)(2) (receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography)." Although the categories of items are broad, the limitations are clear. As the Second Circuit held in United States v. Ulbricht, 858 F.3d 71 (2nd Cir.), cert. denied, 138 S. Ct. 2708 (2018), in connection with searches of computers, "it is important to bear in mind that a search warrant does not necessarily lack particularity simply because it is broad." Id. at 100. Moreover, in words equally relevant here, the Second Circuit stated that "it will often be impossible to identify in advance the words or phrases that will separate relevant files or documents before the search takes place, because officers cannot readily anticipate how a suspect will store information related to the charged crimes." Id. at 102. Evaluating the search warrant and in particular Attachment B, the Court concludes that it satisfies the dictates of the Fourth Amendment in that it adequately describes the place to be searched and the items to be seized with respect to the electronic devices and media.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Samuel Smith, Jr.'s Motions to Suppress Statements [ECF No. 73] and Physical Evidence [ECF No. 75] be **DENIED**.

The parties are advised that they have **fourteen (14)** days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in the waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

This matter will be set for trial at a later date before the Honorable Catherine D. Perry, United States District Judge.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of September, 2019